**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FRANKLIN LOUFRANI, an individual, and ) 
THE SMILEY COMPANY SPRL, ) 
a Belgian company, ) 
           ) 
      Plaintiffs/Counter-Defendants, ) 
           )     Case No.   09 CV 3062
         v. )     JUDGE VIRGINIA KENDALL
           )     MAGISTRATE JUDGE BROWN
WAL-MART STORES, INC., ) 
           ) 
      Defendant/Counter-Plaintiff. ) 

**MEMORANDUM OF COUNTER-PLAINTIFF WAL-MART STORES, INC.**
**IN OPPOSITION TO COUNTER-DEFENDANTS' MOTION TO DISMISS**
**COUNTS II-VI OF WAL-MART'S COUNTERCLAIM**

Respectfully submitted,

Dated: September 23, 2009

By: s/ Wendi E. Sloane
    Robert E. Shapiro (#03125180)
    Wendi E. Sloane (#06183926)
    Rebecca Ray (#06283807)
    BARACK FERRAZZANO
    KIRSCHBAUM & NAGELBERG LLP
    200 W. Madison Street, Suite 3900
    Chicago, Illinois 60606
    (312) 984-3100 (phone)
    (312) 984-3150 (fax)

    *Counsel for Defendant*
    *Counterclaim-Plaintiff*
    WAL-MART STORES, INC.

Defendant/Counter-Plaintiff Wal-Mart Stores, Inc. ("Wal-Mart") submits the following memorandum in opposition to the motion of Plaintiffs/Counter-Defendants Franklin Loufrani ("Loufrani") and The Smiley Company SPRL ("Smiley Co.") (collectively, "Plaintiffs") to dismiss Counts II-VI of Wal-Mart's Counterclaim.

## I. INTRODUCTION

In its March 20, 2009 Order, the Trademark Trial and Appeal Board ("TTAB") of the United States Patent & Trademark Office ("PTO") sustained Wal-Mart's opposition to Plaintiffs'

intent-to-use applications to register their proposed mark,  (the "Loufrani Smiley Face Design") for over 1,000 goods and services and dismissed Plaintiffs' opposition to Wal-

Mart's use-based application to register its Mr. Smiley Mark for Wal-Mart's retail store services. The TTAB concluded that Wal-Mart was the senior user with protectable rights in its Mr. Smiley Mark as a result of its extraordinary advertising and promotion of the mark before Loufrani filed his intent-to-use application. The TTAB also determined that Plaintiffs' Smiley Face Design was descriptive and not entitled to registration. Finally, the TTAB concluded that Plaintiffs' Smiley Face Design, if it were used for the products identified in the applications, would create a likelihood of confusion as to source with Wal-Mart's Mr. Smiley Mark.

Plaintiffs then had a choice. They had the right to appeal the TTAB decision directly to the Court of Appeals for the Federal Circuit under Section 21(a) of the Lanham Act (15 U.S.C. § 1071(a)), in which case the appellate review would be limited only to the record before the

TTAB. Or, Plaintiffs could appeal the TTAB decision to the federal district court under Section 21(b)(1) of the Lanham Act, 15 U.S.C. § 1071(b)(1). Under this alternative, both Plaintiffs and Wal-Mart would have the right to introduce to the district court additional evidence not presented to the TTAB. This is the appellate route Plaintiffs chose.

Plaintiffs' decision to appeal the TTAB decision under Section 21(b)(1) had another consequence, which Plaintiffs now seek to avoid. In a Section 21(b)(1) appeal, Wal-Mart has the right to file permissive Counterclaims, the obligation to file compulsory Counterclaims, and the right to take discovery on them. Accordingly, Wal-Mart filed a six-count Counterclaim, seeking declaratory judgment that the TTAB's decision was correct (Count I) and that, if Plaintiffs were to use the Loufrani Smiley Face Design for the products identified in their application, they will infringe Wal-Mart's trademark rights and violate Illinois common and statutory law (Counts II-VI).

Of course, Plaintiffs do not challenge Wal-Mart's right to bring Count I of its Counterclaim. (Pl. Mem. at 2.) Instead, relying on a single inapposite decision by Judge Pallmeyer, Plaintiffs seek to dismiss the remaining five counts of Wal-Mart's Counterclaim, arguing that these counts do not present a live case or controversy but merely seek an advisory opinion. The sole basis for this contention is that Wal-Mart has not alleged that Plaintiffs have actually used their Smiley Face Design. (Pl. Mem. at 2.) According to Plaintiffs, a trademark owner can never seek a declaration that a junior user's clear and stated intent to use a trademark would, once implemented, constitute trademark infringement. Such a rule would be unworkable. It would require a trademark owner to watch the preparations of the junior user to begin use of the infringing mark, but leave it powerless to protect its mark until the infringement actually begins. This is not the law and it is not what Judge Pallmeyer held. As Plaintiffs' own authority

makes clear, once Plaintiffs and Wal-Mart alleged the facts as they did, the issue of ripeness becomes a factual question that should not be determined on a motion to dismiss. Accordingly, this Court should deny Plaintiffs' motion to dismiss.

## II. WAL-MART'S COUNTERCLAIM ALLEGATIONS

Plaintiffs acknowledge that, when considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all facts alleged in the Counterclaim and must construe all reasonable inferences in Wal-Mart's favor. *See, e.g., Krause v. Turnberry Country Club*, 571 F. Supp. 2d 851, 855 (N.D. Ill. 2008) (Kendall, J.). As set out in Wal-Mart's well-pled allegations, Wal-Mart's Counterclaims arise out of the Plaintiffs' stated *bona fide* intent to use and/or license the Loufrani Smiley Face Design in connection with over 1,000 goods and services in 24 International Classes, and their ability and preparations to implement this intent. (Cntrclm. ¶ 1.) These allegations, particularly in light of Plaintiffs' own admissions in their complaint, are sufficient to state a live claim here.

Wal-Mart, one of the world's largest and most prominent retailers, began using the Mr. Smiley Mark no later than January 1996, in connection with its retail services. (Cntrclm. ¶¶ 12, 14-15.) Wal-Mart engaged in extraordinary advertising and promotion of its Mr. Smiley Mark, featuring it in national advertising circulars, on prime-time network and cable commercials (Cntrclm. ¶ 16), and throughout its thousands of Wal-Mart retail stores, including on its in-store television network, vests worn by employees, buttons, balloons, and in-store signage. (Cntrclm. ¶ 17.) As a result, before June 1997, Wal-Mart's Mr. Smiley Mark had become a distinctive indicator of source for Wal-Mart's retail store operations and, as such, had acquired secondary meaning to the consuming public. (Cntrclm. ¶ 18.)

On June 3, 1997,[1] Loufrani filed an intent-to-use application, subsequently divided, to register the Loufrani Smiley Face Design in 24 International Classes. (Cntrclm. ¶ 22.) The applications asserted that Loufrani had a *bona fide* intent to use the Loufrani Smiley Face Design in connection with over 1,000 unrelated products and services. (Cntrclm. ¶ 24.) Many of the goods and services for which Plaintiffs sought to register the Loufrani Smiley Face Design overlap with products Wal-Mart offers for sale in its retail and online stores.[2] (Cntrclm. ¶ 24.)

Wal-Mart opposed both of Plaintiffs' applications to register the Loufrani Smiley Face Design. (Cntrclm. ¶¶ 26, 27.) Wal-Mart also filed its own use-based application to register its Mr. Smiley Mark in International Class 35 for retail store operations. (Cntrclm. ¶ 28.) Plaintiffs opposed the registration of the Mr. Smiley Mark. (Cntrclm. ¶ 28.) The TTAB consolidated Plaintiffs' opposition to Wal-Mart's registration of the Mr. Smiley Mark and Wal-Mart's oppositions to Plaintiffs' applications to register the Loufrani Smiley Face Design. (Cntrclm. ¶ 29.)

On March 20, 2009, the TTAB determined that (a) Wal-Mart's Mr. Smiley Mark had acquired secondary meaning through Wal-Mart's impressive media campaign, (b) the Loufrani Smiley Face Design was descriptive and therefore was not entitled to registration, and (c) if used for the products identified in its application, the Loufrani Smiley Face Design would create a likelihood of confusion as to source with Wal-Mart's Mr. Smiley Mark. (Cntrclm. ¶¶ 33-35.)

Plaintiffs then filed this action to appeal the TTAB decision under Section 21(b)(1) of the Lanham Act. In their complaint, Plaintiffs assert:

---

[1] In Wal-Mart's Counterclaim, Wal-Mart alleges that Loufrani filed its intent-to-use application on June 3, 2007. (Cntrclm. ¶ 22.) Plaintiffs are correct that this was a typo – the year should be 1997. Wal-Mart apologizes for the error.

[2] Loufrani purportedly assigned his applications to The Smiley Co. on June 22, 2008. (Cntrclm. ¶ 23.)

- They own trademark registrations for the SMILEY word mark and the Loufrani Smiley Face Design in over 85 countries (Cmplt. ¶ 24);

- They own a portfolio of nine registrations for SMILEY and SMILEY-related marks in the United States (Cmplt. ¶ 25);

- They have extensively licensed the SMILEY word mark and the Loufrani Smiley Face Design for the worldwide manufacturing of a "variety of goods" (Cmplt. ¶ 25);

- They have used a mark similar to the Loufrani Smiley Face Design on clothing, mugs, bags and plush toys beginning in June 1997 (Cmplt. ¶ 10); and

- They have promoted their licensing business in the United States through, among other channels, participation in major licensing shows since 1997. (Cmplt. ¶ 26.)

Because Plaintiffs elected to appeal the TTAB decision to the District Court under Section 21(b)(1) of the Lanham Act, Wal-Mart had the right to file permissive counterclaims and the obligation to file compulsory counterclaims. Wal-Mart therefore filed a six-count Counterclaim seeking declarations:

- affirming the TTAB's decision allowing registration of Wal-Mart's Mr. Smiley Mark and denying Plaintiffs' applications to register the Loufrani Smiley Face Design (Count I; Cntrclm. ¶ 43);

- that Plaintiffs' use and/or licensing of the Smiley Face Design would constitute, and if used has constituted, infringement of Wal-Mart's Mr. Smiley Mark and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1143(a) (Count II; Cntrclm. ¶ 57);

- that Plaintiffs' use and/or licensing of the Loufrani Smiley Face Design would constitute, or if such use or licensing has begun constitutes, trademark infringement of Wal-Mart's Mr. Smiley Mark under Section 32 of the Lanham Act, 15 U.S.C. § 1114(1) (Count III; Cntrclm. ¶ 67);

- that Plaintiffs' use and/or licensing of the Loufrani Smiley Face Design constitutes and if used has constituted, common law trademark infringement of Wal-Mart's Mr. Smiley Mark (Count IV; Cntrclm. ¶ 79);

- that Plaintiffs' use and/or licensing of the Loufrani Smiley Face Design would constitute, and if used has constituted, a violation of the Illinois Uniform Deceptive Trade Practices Act (Count V; Cntrclm. ¶ 87); and

- that Plaintiffs' use and/or licensing of the Loufrani Smiley Face Design would constitute, and if used has constituted, a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. (Count VI; Cntrclm. ¶ 94.)

Plaintiffs seek to dismiss Counts II-VI, arguing they are not ripe because Plaintiffs have not actually used the Loufrani Smiley Face Design.

## III. ARGUMENT

There is no dispute regarding the pleading standard necessary to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, which the Supreme Court recently clarified in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). As this Court has recognized, all that is required to "state a claim upon which relief can be granted" is "a short and plain statement of the claim showing that the pleader is entitled to relief." *Krause,* 571 F. Supp. 2d at 855-86. This does not require that Wal-Mart, the Counterclaim-Plaintiff, "allege all facts involved in the claim." *Id.* at 856. Rather, "the claim must be supported by facts that, if taken as true, at least plausibly suggest that the plaintiff is entitled to relief." *Id.* at 856. The facts alleged must "raise a reasonable expectation that discovery will reveal evidence" that the plaintiff is entitled to relief. *Id.* (quoting *Bell Atlantic Corp. v. Twombly, supra,* 127 S. Ct. at 1974); *see also AARP v. 200 Kelsey Assocs., LLC*, No. 06 Civ. 81 (SCR), 2009 U.S. Dist. LEXIS 969, at *6 (S.D.N.Y. Jan. 8, 2009) ("A motion to dismiss for failure to state a claim . . . will be granted only where the plaintiff has not alleged enough facts to state a claim to relief that is plausible on its face.").[3] Counts II-VI of Wal-Mart's Counterclaim meet this standard.

---

[3] Per the Court's standing order, a copy of *AARP v. 200 Kelsey Associates, LLC*, No. 06 Civ 81 (SCR), 2009 U.S. Dist. LEXIS 969 (S.D.N.Y. Jan. 8, 2009) is attached hereto as Exhibit A.

A.    **Counts II-VI of Wal-Mart's Counterclaim Allege Facts Sufficient to Establish an Actual Case or Controversy.**

Plaintiffs' primary challenge to Counts II-VI of Wal-Mart's Counterclaim is ripeness. According to Plaintiffs, because they have filed only intent-to-use applications and because the Counterclaim does not allege that Plaintiffs have actually used the Loufrani Smiley Face Mark, there is no actual case or controversy to support Wal-Mart's claims for declaratory relief. (Pl. Mem. at 6.) Plaintiffs' argument is legally wrong.

    1.    **Actual use is not required to support claims seeking a declaration of infringement.**

Wal-Mart acknowledges that the predicate for a declaratory judgment claim is the existence of an actual case or controversy between the parties. Plaintiffs have applied the incorrect standard, however, for making this determination in a trademark action.

The United States Supreme Court's recent decision in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 S. Ct. 764 (2007), "lowered the threshold" for proving an actual case or controversy in the context of intellectual property-related declaratory judgment actions. *AARP*, 2009 U.S. Dist. LEXIS. at *17. Under *MedImmune,* jurisdiction is not defeated by a party's decision to refrain from taking some action so that the threat of suit is not imminent, as long as "[t]he factual and legal dimensions of the dispute are well-defined" and "nothing about the dispute would render it unfit for judicial resolution." 549 U.S. at 128.

The district courts have since concluded that, under *MedImmune,* "[a] defendant need not have engaged in actual manufacture, use, or sale of a potentially infringing product for a plaintiff to seek a declaratory judgment of infringement." *Young v. Vannerson*, 612 F. Supp. 2d 829, 838-39 (S.D. Tex. 2009). Rather, "[a] case or controversy exists in the trademark context 'where a party has engaged in a course of conduct evidencing a definite intent and apparent ability to

commence use of the [allegedly infringing] marks on a product.'" *Id.* (citing and quoting *Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 595-96 (2d Cir. 1996)).

This question is, by its nature, ill-suited to be determined on a motion to dismiss, before the plaintiff (or, as here, the Counterclaim-Plaintiff) has had the opportunity to conduct discovery on this issue. As a result, intent-to-use applicants have, as a general rule, been unsuccessful in dismissing, at the pleading stage, actions against them seeking a declaration of infringement.

For example, in *Young v. Vannerson,* 612 F. Supp. 2d 829, one day after Vincent Young's MVP Rose Bowl performance, the defendants filed four intent-to-use trademark applications seeking to register the marks "VY" and "INVINCEABLE" for a variety of commercial products. Young asserted prior trademark rights in "VY" and "INVINCEABLE". *Id.* at 834-35. Young first filed oppositions to defendants' applications. While Young's oppositions were pending before the TTAB, Young filed a district court action seeking injunctive and declaratory relief. *Id.* at 836.

Defendants moved to dismiss Young's claims on the same basis that Plaintiffs now seek to dismiss Counts II-VI of Wal-Mart's Counterclaim, asserting that the action was premature because the marks had not been used in commerce. In a well-reasoned decision, the court denied the motion to dismiss, explaining that, under the *MedImmune* analysis, "whether there has been potentially infringing activity or meaningful preparation to conduct potentially fringing activity is also an important element in the totality of circumstances which must be considered in determining whether a declaratory judgment is appropriate."[4] *Id.* at 841-42.

---

[4] Regarding the question of "meaningful preparation," the court explained that if "a party has taken steps such as producing prototypes or samples of the allegedly infringing products, soliciting business from and sending advertising to potential customers, or otherwise investing significant funds in preparation to

Similarly, in *AARP v. 200 Kelsey Associates, LLC*, 2009 U.S. Dist. LEXIS 969, plaintiff AARP sought a declaratory judgment that defendants' proposed MODERN MATURITY mark, for which defendants had filed an intent-to-use application, infringed AARP's MODERN MATURITY mark. Defendants moved to dismiss under Rule 12(b)(6), alleging that the claim was not ripe because they had not actually used the mark. As in *Young*, the court denied the motion to dismiss, holding that actual use is not required to sustain an action seeking a declaratory judgment based upon an intent-to-use application. Instead, there must only be some level of preparation, which, while not rising to the level of actual use, constitutes more than mere intent to use. 2009 U.S. Dist. LEXIS 969, at *27-28.

In *AARP*, defendants had taken steps toward realizing their intent-to-use the allegedly infringing mark, including "actively seeking licensees to publish a magazine [using *AARP's* mark] and conducting an extensive analysis of the publishing industry." *Id.* In holding that it had subject matter jurisdiction, the court reasoned that "[p]laintiff need not wait for defendants to actually secure that [licensing] partner before filing suit." *Id.*

In this case, Wal-Mart has not had the full opportunity to engage in discovery regarding Plaintiffs' level of preparation to begin to use the Loufrani Smiley Face Design with any of the products listed in its application. Nevertheless, one need look no farther than Plaintiffs' own allegations to learn that Plaintiffs have the "definite intent and apparent ability" to commence use of the Loufrani Smiley Face Design, and that they have engaged in "meaningful preparation" to do so. *Young*, 612 F. Supp. 2d at 841-42.

---

produce the products, the case or controversy requirement is satisfied." 612 F. Supp. 2d at 844. The court held that because defendants had produced samples of various products incorporating the marks, had tested the market, and contracted with a manufacturer, the defendants had engaged in "meaningful preparation," such that Young's claims satisfied Article III's case or controversy requirement. *Id.* at 847.

Plaintiffs allege that Loufrani has been in business since the 1970s (Cmplt. ¶¶ 4, 24); Plaintiffs are actively using and licensing the Loufrani Smiley Face Design for a variety of products throughout the world (Cmplt. ¶ 24); they own a portfolio of registrations for related marks in the United States which are being used (Cmplt. ¶ 25); and they are, and have been since 1997, actively promoting their licensing business (Cmplt. ¶ 26), and they have used a mark similar to the Loufrani Smiley Face Design on clothing, mugs, bags and plush toys beginning in June 1997 (Cmplt. ¶ 10). Plaintiffs thus concede they have the ability to promptly begin use of the Loufrani Smiley Face Design, given their manufacturing network, use of other related marks on goods, and efforts to find U.S. licensees.

These activities, which Plaintiffs themselves admit, show the type of "meaningful preparation" that the courts in *Young* and *AARP* found sufficient to establish ripeness and to preclude dismissal of the claims seeking declaratory judgment of infringement. So too here, the Court should deny Plaintiffs' motion to dismiss Counts II through VI of the Counterclaim.

### 2. Plaintiffs' sole authority, *Geisha, LLC v. Tuccillo,* is not on point.

In the face of this unanimous authority to the contrary (of which Plaintiffs make no mention), Plaintiffs invoke a single decision, *Geisha, LLC v. Tuccillo,* 525 F. Supp. 2d 1002 (N.D. Ill. 2007), in support of their argument that actual use is required to support a declaratory judgment action. *Geisha* does not stand for this proposition.

*First*, Judge Pallmeyer decided *Geisha* on cross-motions for ***summary judgment,*** not on a motion to dismiss.[5] The parties had already engaged in extensive discovery regarding the extent

---

[5] As Plaintiffs recite in their memorandum, the plaintiff in *Geisha LLC* owned an Illinois state registration for the mark JAPONAIS for a highly successful restaurant it operated in Illinois. The plaintiff in that case was planning to open restaurants under the JAPONAIS marks in New York and Las Vegas. After the opening of plaintiff's Illinois restaurant, but before the opening of its New York

of defendant's meaningful preparations to use the allegedly infringing mark. *Id.* at 1004. Here, in contrast, discovery on this issue has not yet commenced.

*Second*, rather than holding that actual use is required to sustain a declaratory judgment claim, *Geisha* expressly left that question open:

> [I]t is unclear whether the fact that Tuccillo was not using the mark would, in itself, defeat declaratory judgment jurisdiction. Although Tuccillo is correct that "no rights are conferred by the filing of a federal trademark application" [citation omitted], Tuccillo cites no authority for the further proposition that his inability to assert enforceable trademark rights in a suit against Geisha would necessarily preclude **Geisha** from invoking declaratory judgment jurisdiction in a suit against **him.**

*Id.* at 1018 (emphasis in the original).[6] The subsequent and well-reasoned decisions in *AARP* and *Young* have answered the question left open in *Geisha LLC,* finding that actual use is <u>not</u> required to created declaratory judgment jurisdiction where there are allegations of meaningful preparation to commence use.

*Third*, the discovery that the parties conducted in *Geisha, LLC* established that the defendant had not engaged in meaningful preparations to use the mark and appeared to have no ability to do so. Based on the evidentiary record before her, she relied on the facts that:

- Defendant's steps toward opening a restaurant consisted only of playing around with a menu and searching for a suitable location, but "[t]he former is of little consequence and the latter activity would carry more significance but for the fact … [it] does not appear either serious or advanced." *Id.* at 1015.

- There was no evidence defendant had ever opened a restaurant or any an experience in this field. *Id.*

---

restaurant, defendant filed an intent-to-use application to register the JAPONAIS mark for lounge and restaurant services. After discovery, both parties moved for summary judgment. Judge Pallmeyer concluded that Geisha had not established that the defendant had the ability or had engaged in any meaningful preparation to open its own restaurant.

[6] *Geisha* confronted the converse of the fact pattern presented here. Rather than the trademark owner seeking a declaration of infringement against a subsequently-filed intent-to-use application, *Geisha* addressed a trademark owner's efforts to obtain summary judgment on a claim for a declaration of trademark infringement.

Here, Plaintiffs' own complaint admits preparation and ability much more extensive than that in the evidentiary record in *Geisha LLC.* (*See supra,* p. 5.) And, of course, there had been no discovery of the full extent of Plaintiffs' preparation.

**B.    THIS COURT HAS JURISDICTION UNDER SECTION 21(B)(1) TO HEAR WAL-MART'S INFRINGEMENT CLAIMS.**

Apparently regretting the expanded jurisdiction resulting from their decision to appeal the TTAB decision under Section 21(b)(1) of the Lanham Act, Plaintiffs argue that Wal-Mart's Counterclaim is "an improper extension of the TTAB's findings in the limited context of trademark registration." (Pl. Mem. at 8.) Plaintiffs claim that the TTAB's determination of likelihood of confusion for purposes of determining whether a mark is entitled to registration is more limited than a district court's determination of likelihood of confusion in an infringement action. Plaintiffs conclude that Wal-Mart is limited to the question of likelihood of confusion in the registration context. This argument is truly puzzling and wrong.

As a threshold matter, Section 21(b)(1) of the Lanham Act expressly permits Wal-Mart to assert counterclaims and requires Wal-Mart to assert its compulsory counterclaims. *Wells Fargo & Co. v. Stagecoach Props.,* 685 F.2d 302, 309 n. 8 (9th Cir. 1982). Nothing in Section 21(b)(1) or the case law decided thereunder limits the appellee/defendant to asserting counterclaims based on the scope of the TTAB's authority. *Wells Fargo,* 685 F.2d at 309 n. 8; *Sprinklets Water Ctr., Inc. v. McKesson Corp.,* 806 F. Supp. 656, 662 (E.D. Mich. 1992). While it is true that Wal-Mart cannot raise new legal issues to the district court, Wal-Mart did assert before the TTAB that Plaintiffs' registration and use of the Loufrani Smiley Face Design would create a likelihood of confusion with its Mr. Smiley trademark. The legal issue was properly raised before the TTAB, and Wal-Mart can now assemble additional facts on likelihood of confusion.

Plaintiffs cite no authority that supports its effort to limit this Court's jurisdiction. *Rosenruist-Gestao E Servicos LDA v. Virgin Enterprises Ltd.*, 511 F.3d 437, 443 (4th Cir. 2007), which Plaintiffs cite, stands for no such thing. The court did not address whether, in a Section 21(b)(1) appeal, a party was limited to addressing likelihood of confusion only for purposes of registration and not infringement. The issues in *Rosenruist-Gestao* were procedural and the court was merely commenting on the roles of the PTO and the TTAB.

To the contrary, the PTO's refusal to register a trademark on the ground that it creates a likelihood of confusion with a prior registration, "while not conclusive is entitled great weight" by the district court in an infringement action. *Syntax Labs., Inc. v. The Norwich Pharmacal Co.*, 437 F.2d 566, 569 (2d Cir. 1971).

### C.    WAL-MART HAS ADEQUATELY PLED ITS CONSUMER FRAUD CLAIM IN COUNT VI OF ITS COUNTERCLAIM.

Plaintiffs assert an additional argument to dismiss Wal-Mart's claim under the Illinois Consumer Fraud and Deceptive Business Practices Act (the "CFA"). Plaintiffs argue that because actual damages are an element of a CFA claim, Wal-Mart cannot seek a declaratory judgment that Plaintiffs' use of the Loufrani Smiley Face Design would constitute a violation of the CFA.

Plaintiffs misconstrue Count VI of Wal-Mart's Counterclaim. Count VI does not allege a violation under the CFA. Rather, Wal-Mart seeks a declaration that Plaintiffs' use of the Loufrani Smiley Face Design would constitute a violation of the CFA and that Wal-Mart would be damaged by Plaintiffs' use.

None of the three cases Plaintiffs cite support their argument. (Pl. Mem. at 9.) As a threshold matter, none of the cases involved a claim for declaratory judgment under the CFA. Further, they are irrelevant. The discussion of the CFA in *Smith v. Prime Cable of Chicago*, 276

Ill. App. 3d, 843, 855, 658 N.E. 2d 1325, 1335 (1st Dist. 1995), was not published under Illinois Supreme Court Rule 23(e) and is therefore not entitled to precedential value.[7] In *L'Oreal USA, Inc.,* 583 F. Supp. 2d 954 (N.D. Ill. 2008), the court dismissed the CFA claim because plaintiff, who alleged she was exposed to undisclosed lead in defendant's lipstick, failed to allege any economic loss as a result of the purported fraud. In *Langdendorf v. Consenco Senior Health Insurance Co.,* 590 F. Supp. 2d 1020 (N.D. Ill. 2008), the court dismissed the CFA claim because it was really just a breach of contract claim, which is not actionable under the CFA.

## IV. **CONCLUSION**

Wal-Mart respectfully requests that, for all of the foregoing reasons, Plaintiffs' Motion to Dismiss Counts II through VI of Wal-Mart's Counterclaim be denied or, alternatively, that Wal-Mart be granted leave to replead.

---

[7] In any event, *Smith* undercuts the proposition for which it is cited. The court observed that a plaintiff may seek injunctive relief under the CFA if it can plead facts to show it would be damaged in the future. 276 Ill. App. 3d, at 859, 658 N.E. 2d at 1337.

## CERTIFICATE OF SERVICE

I, Wendi E. Sloane, one of the attorneys for Defendant Wal-Mart Stores, Inc., do hereby certify that I have this day caused a true and correct copy of the foregoing **Memorandum of Counter-Plaintiff Wal-Mart Stores, Inc. in Opposition to Counter-Defendants' Motion to Dismiss Counts II-VI of Wal-Mart's Counterclaim** to be served upon the following according to ECF Rules in compliance with Fed. Rule Civ. P. 5(b)(2)(D):

Steven L. Baron
Natalie A. Harris
Lindsay H. LaVine
Mandell Menkes LLC
333 West Wacker Drive, Suite 300
Chicago, IL 60606

s/ Wendi E. Sloane

# EXHIBIT A



LEXSEE 2009 U.S. DIST. LEXIS 969

**AARP, Plaintiff, -v.- 200 KELSEY ASSOCIATES, LLC, and MICHAEL REICH, Defendants.**

**06 Civ. 81 (SCR)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2009 U.S. Dist. LEXIS 969*

**January 6, 2009, Decided**
**January 8, 2009, Filed**

**COUNSEL:** [*1] For plaintiff: Chryssa V. Valletta, John J. Dabney (of Counsel), McDermott Will & Emery LLP, New York, NY.

For defendants: Edmund J. Ferdinand, III, Susan M. Schlesinger (of Counsel), Grimes & Battersby, LLP, New York, NY.

**JUDGES:** GERARD E. LYNCH, United States District Judge.

**OPINION BY:** GERARD E. LYNCH

**OPINION**

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge:

Plaintiff AARP commenced this action against defendants 200 Kelsey Associates, LLC, and its principal shareholder and managing member, Michael Reich, alleging trademark infringement and related causes of action in violation of the Lanham Act, *15 U. S.C. § 1051 et seq.*, and New York state law. Plaintiff seeks, inter alia, permanent injunctive relief and a declaration that its federal trademark registration is valid and has been (and will be) infringed by defendants. Pursuant to *Federal Rules of Civil Procedure 12(b)(1)* and *12(b)(6)*, defendants now move to dismiss the complaint for lack of jurisdiction and for failure to state a claim. The motion will be denied. [1]

    1 Due to an extreme backlog in the White Plains Division of this Court, this matter was recently assigned by the Chief Judge to the undersigned judge, solely for purposes of deciding the instant long-pending [*2] motion, with the gracious consent of the Honorable Stephen C. Robinson, United States District Judge, to whom this case is otherwise assigned. The case remains assigned to Judge Robinson for all other purposes.

**BACKGROUND**

The facts set forth below are based on the allegations of the complaint, which are assumed to be true for purposes of resolving this motion to dismiss.

A. The Dispute

Plaintiff AARP is a non-profit organization dedicated to addressing the needs, and promoting the interests, of persons age 50 and older. (Compl. P8.) [2] With a membership exceeding 35 million, it is the largest membership organization in the United States for persons in that age category. (Id. PP 8-9.) In 1958, AARP launched its flagship publication, Modern Maturity magazine. (P. Mem. 1.) In 1962, AARP obtained a federal trademark registration for the Modern Maturity mark. (Id. 3; cf. Compl. P 12.) Modern Maturity was provided to AARP members for some 45 years. (Compl. P 10; P. Mem. 1, 3.) During that time, AARP invested hundreds of millions of dollars in the Modern Maturity mark. (Compl. P 13.) While AARP changed the name of its publication to *AARP The Magazine* in 2003, it owns and uses domain names containing [*3] the Modern Maturity mark, provides back issues of Modern Maturity on its website, and employs the Modern Maturity mark in connection with various other products and services. (Id. PP 13-15.)

2    All references to the complaint are to plaintiff's First Amended Complaint, dated January 11, 2006.

Defendants 200 Kelsey Associates and Michael Reich seek to launch a new magazine called Modern Maturity, which is also intended for senior citizens. (Id. P 20; P. Mem. 3.) In preparation for this launch, they have contacted potential publishers, generated written business plans concerning the design and sale of the magazine, and engaged in extensive market analysis. (Compl. P 23; P. Mem. 3-4.) Defendants have also filed an intent-to-use trademark application with the United States Patent and Trademark Office ("PTO") for "Modern Maturity," a "[m]agazine published periodically in the field of mature lifestyles." (Compl. P 20.) This application included a sworn declaration attesting defendants' bona fide intent to use the Modern Maturity mark in commerce. (Id. P 23.)

The PTO rejected defendants' application on the ground that the mark they sought to register was confusingly similar to AARP's registered [*4] Modern Maturity mark. (Id. P 20.) Following that decision, defendants petitioned the Trademark Trial and Appeal Board ("TTAB") to cancel plaintiff's registration of the Modern Maturity mark, arguing that the mark has been abandoned. (Id. P 21; D. Mem. 1.) Proceedings on that petition were suspended pending the outcome of this action. (Compl. P 21; P. Mem. 12.)

B. Procedural History

On January 5, 2006, AARP brought this action, alleging trademark infringement and various related causes of action in violation of the Lanham Act and New York state law. Defendants consented to entry of a preliminary injunction enjoining defendants' use or attempted use of the Modern Maturity mark, which was duly entered on March 7, 2006. On April 20, 2006, defendants moved pursuant to *Federal Rules of Civil Procedure 12(b)(1)* and *12(b)(6)* to dismiss the complaint for lack of jurisdiction and for failure to state a claim.

Defendants argue that because plaintiff has not alleged that they have actually published or begun selling their Modern Maturity magazine, plaintiff can demonstrate neither the existence of a case or controversy sufficient to confer jurisdiction on this Court (D. Mem. 12-13), nor the "use [*5] in commerce" of the Modern Maturity mark required to state a claim for trademark infringement and the related causes of action alleged in the complaint. (Id. 2, 3-8.) Defendants further argue that, absent subject matter jurisdiction over plaintiff's trademark infringement and related claims, plaintiff's request for a declaration of the validity of its trademark registration is improper. (D. Mem. 9-10.)

In opposition, plaintiff contends that it need not wait to seek relief until defendants' magazine actually hits the newsstand. Rather, it need only "allege sufficient facts, including reasonable inferences that can be drawn from those facts, which show that defendant[s] ha[ve] used the allegedly infringing mark in commerce or that such use is imminent and impending." (P. Mem. 2.) Because plaintiff has alleged that defendants "are actively seeking licensees to publish a magazine called 'Modern Maturity'" and "have conducted [an] extensive analysis of the publishing industry" in preparation for the launch of such a publication (Compl. P 23), it argues that it has satisfied the relevant standards and that defendants' motion to dismiss should be denied in its entirety. (P. Mem. 2-4.)

DISCUSSION

I. [*6] Motion To Dismiss Standard

A motion to dismiss for lack of subject matter jurisdiction will be granted "when the district court lacks the statutory or constitutional power to adjudicate" an action. *Luckett v. Bure, 290 F.3d 493, 496 (2d Cir. 2002)*, quoting *Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).* A motion to dismiss for failure to state a claim, which "tests the facial legal sufficiency of the complaint," *Rolls-Royce Motor Cars, Inc. v. Schudroff, 929 F. Supp. 117, 121 (S.D.N.Y. 1996),* will be granted only where the plaintiff has not alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007).*

In resolving such motions to dismiss, a court must accept as true all factual allegations in the complaint, and draw all reasonable inferences in the light most favorable to the plaintiff. See *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 198 (2d Cir. 1992); Heidsieck & Co. Monopole S.A. v. Piper-Heidsieck, No. 98 Civ. 7741, 2001 U.S. Dist. LEXIS 2794, 2001 WL 263029, at *3 (S.D.N.Y. Mar. 15, 2001).* "However, argumentative inferences favorable to the party asserting jurisdiction should not be drawn." [*7] *Atlantic Mut. Ins. Co., 968 F.2d at 198.*

Because dismissal of an action for lack of jurisdiction renders all other accompanying motions moot, see *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990),* and because "a disposition of a *Rule 12(b)(6)* motion is a decision on the merits and, therefore, an exercise of jurisdiction," *Magee v. Nassau County Med. Ctr., 27 F. Supp. 2d, 154, 158 (E.D.N.Y. 1998),* a court confronted with motions to dismiss both for lack of jurisdiction and for failure to state a claim should decide the jurisdictional question first. See *Rhulen, 896 F.2d at 678; Magee, 27 F. Supp. 2d at 158.* In doing so, "the plaintiff asserting subject matter juris-

2009 U.S. Dist. LEXIS 969, *

diction has the burden of proving by a preponderance of the evidence that [jurisdiction] exists." *Luckett, 290 F.3d at 497.*

## II. Motion To Dismiss for Lack of a Case or Controversy

Defendants argue that the Court lacks jurisdiction to issue a declaratory judgment regarding plaintiff's trademark infringement claim because there is no actual controversy between the parties. (D. Mem. 10.) By defendants' account, nothing short of their actually publishing, distributing, selling, or offering to sell [**8**] a magazine called Modern Maturity would create a case or controversy. (Id. 2.) Plaintiff, however, argues that, in preparation for the launch of their magazine, defendants have used the Modern Maturity mark in numerous ways, and that this use is sufficient to bring the parties into adversarial conflict. (P. Mem. 13; cf. id. 7-8.) Because defendants overstate the threshold for demonstrating the existence of a case or controversy, and plaintiffs have demonstrated the existence of a case or controversy, defendants' jurisdictional motion is denied. [3]

> 3 Defendants also argue that plaintiff's failure to allege actual use in commerce defeats the existence of any federal question, thus providing an independent basis for dismissal. (D. Mem. 11.) This argument overlaps defendants' *Rule 12(b)(6)* motion, which is addressed below.

Article III of the United States Constitution limits the subject matter jurisdiction of the federal courts to cases or controversies. See U.S. Const. Art. III § 2. This "case or controversy requirement" is the basis for the doctrines of mootness, ripeness, and standing. See *DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 335, 126 S. Ct. 1854, 164 L. Ed. 2d 589 (2006).* The Declaratory Judgment Act (the "Act") [**9**] provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *28 U.S.C. § 2201(a).* Although declaratory judgment actions were once thought to be inherently at odds with the case or controversy requirement, see *Willing v. Chicago Auditorium Ass'n, 277 U.S. 274, 289, 48 S. Ct. 507, 72 L. Ed. 880 (1928),* the constitutionality of the Act has long been established, primarily because a plaintiff seeking relief pursuant to its terms still must establish the existence of a controversy within the meaning of Article III. [4] See *Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 239-40, 57 S. Ct. 461, 81 L. Ed. 617 (1937);* see also *Matthew Bender & Co., Inc. v. West Publ'g Co., No. 94 Civ. 0589, 1996 U.S. Dist. LEXIS 5871, 1996 WL 223917, at *1 (S.D.N.Y. May 2, 1996)*

(noting that plaintiff bears the burden of demonstrating that jurisdiction over the declaratory judgment action existed at the time the action was filed and has continued to exist since that time).

> 4 The Act does not supply an independent ground for subject matter jurisdiction. Thus, "an action for declaratory relief under [**10**] the Act may ordinarily be brought only if subject matter jurisdiction would exist in a coercive action between the parties." *Progressive Apparel Group, Inc. v. Anheuser-Busch, Inc., No. 95 Civ. 2794, 1996 U.S. Dist. LEXIS 1292, 1996 WL 50227, at *2 (S.D.N.Y. Feb. 8, 1996).*

The Supreme Court has not articulated a bright-line rule for determining when a case satisfies the controversy requirement. In fact, it has stated that "[t]he difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy." *Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273, 61 S. Ct. 510, 85 L. Ed. 826 (1941).* Claims that involve "contingent future events that may not occur as anticipated, or indeed may not occur at all," will not suffice. *Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580-81, 105 S. Ct. 3325, 87 L. Ed. 2d 409 (1985)* (quotation omitted). Rather, "[t]he disagreement . . . must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in [**11**] deciding them." *Jenkins v. United States, 386 F.3d 415, 417-18 (2d Cir. 2004)* (quotation omitted).

Even after a plaintiff demonstrates that the case or controversy requirement has been met, the permissive language of *§ 2201(a)* gives a district court discretion to determine whether or not it should actually exercise its declaratory judgment authority. A court must, however, exercise that authority "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Continental Cas. Co. v. Coastal Sav. Bank, 977 F.2d 734, 736 (2d Cir. 1992).*

Declaratory judgment actions involving intellectual property rights are most often brought by potential infringers seeking a declaration of noninfringement or invalidity. [5] See, e.g., *Lang v. Pac. Marine & Supply Co., Ltd., 895 F.2d 761, 763 (Fed. Cir. 1990); Airship Indus. (UK) Ltd. v. Goodyear Tire & Rubber Co., 643 F. Supp. 754, 759 (S.D.N.Y. 1986).* However, such actions have also been permitted when brought by intellectual prop-

erty owners seeking declarations of impending infringement. [*12] See *Lang, 895 F.2d at 763* (collecting cases). Consistent with the Federal Circuit's holding in Lang, if the controversy requirement is met, there is no apparent reason why plaintiff should be precluded from seeking a declaration of infringement, particularly when defendants could have maintained such an action under the very same circumstances. See *id. at 764* ("If the controversy requirement is met by a sufficient allegation of immediacy and reality, we see no reason why a patentee should be unable to seek a declaration of infringement against a future infringer when a future infringer is able to maintain a declaratory judgment action for noninfringement under the same circumstances. . . . [T]he fact that the patent owner, unlike the accused infringer, will have an express statutory remedy for infringement at a later time is irrelevant. The Declaratory Judgment Act applies 'whether or not further relief is or could be sought.'"), quoting *28 U.S.C. § 2201*.

> 5 A number of the cases cited in this opinion discuss questions of justiciability in the context of patent infringement actions. However, these cases constitute valid precedent given this Court's pronouncement that "[t]here is no persuasive [*13] reason to distinguish between patent infringement and trademark infringement for purposes of determining whether a justiciable controversy exists." Id.

Prior to 2007, "[t]he Second Circuit . . . articulated a two-pronged test for determining the existence of an actual controversy in declaratory judgment cases involving trademarks. First, the defendant's conduct must have 'created a real and reasonable apprehension of liability on the part of plaintiff.' Second, the plaintiff must have 'engaged in a course of conduct which has brought it into adversarial conflict with the defendant.' Both elements must exist at the time the declaratory judgment action is filed." *The Ritz Hotel, Ltd. v. Shen Mfg. Co., 384 F. Supp. 2d 678, 682 (S.D.N.Y. 2005)*; see also *Starter Corp. v. Converse, Inc., 84 F.3d 592, 595 (2d Cir. 1996)*. Because, as discussed above, declaratory judgment actions are most often brought by potential infringers seeking a declaration of noninfringement or invalidity, this test has been modified where the purported *owner* of an intellectual property right seeks a declaratory judgment to protect that right from future infringement. See *Lang, 895 F.2d at 764*. Under the modified test, [*14] for a controversy to exist, "(1) the defendant must be engaged in an activity directed toward making, selling, or using subject to an infringement charge under *35 U.S.C. § 271(a) (1982)*, or be making meaningful preparation for such activity; and (2) acts of the defendant must indicate a refusal to change the course of its actions in the face of acts by the patentee sufficient to create a reasonable ap-

prehension that a suit will be forthcoming." Id. As noted by the Federal Circuit, this test essentially is the converse of the test applied in declaratory judgment actions brought by potential infringers. See *Lang, 895 F.2d at 764*.

Applying these principles, the Second Circuit has concluded that a case or controversy exists in the trademark context "where a party has engaged in a course of conduct evidencing a 'definite intent and apparent ability to commence use' of the [allegedly infringing] marks on [a] product." [6] *Starter Corp., 84 F.3d at 595-96* (quotation omitted). Demonstrating such intent requires more than simply showing that a party has a "vague or general desire" to use the mark(s) at issue. See *id. at 596*. Rather, the party "must be engaged in 'meaningful preparation,' such that [*15] it is 'actively preparing to produce the article in question. This is the last point before the point of no return.'" Id., quoting *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 736 (Fed. Cir. 1988)*; see also *G. Heileman Brewing Co., Inc. v. Anheuser-Busch, Inc., 873 F.2d 985, 990 (7th Cir. 1989)*. Because "[d]eclaratory judgment actions are particularly useful in resolving trademark disputes . . . , the finding of an actual controversy should be determined with some liberality." *Starter, 84 F.3d at 596*. However, even "the most liberal interpretation of justiciability will not admit to an active controversy in the absence of either some imminent infringing conduct *or some assertion of the same.*" Id. (emphasis in original), quoting *Polaroid Corp. v. Berkey Photo, Inc., 425 F. Supp. 605, 609 (D. Del. 1976).*

> 6 Courts in this circuit have, at times, used various formulations of this "intent and ability" test. See *Matthew Bender, 1996 U.S. Dist. LEXIS 5871, 1996 WL 223917, at *2* (collecting cases). However, this Court has noted that "[a]lthough the wording of the[] tests differs somewhat, they share the basic purpose of ensuring that the plaintiff truly intends and is able to undertake a potentially [*16] infringing activity, while acknowledging that 'it would be economically wasteful to require a plaintiff to embark on an actual program of manufacture, use or sale which may turn out to be illegal.' Furthermore, '[w]hether a declaratory plaintiff's ability and definite intention to undertake a potentially infringing activity constitutes sufficient 'preparation' is a question of degree to be resolved on a case-by-case basis.'" *1996 U.S. Dist. LEXIS 5871, [WL] at *3* (quotations omitted).

In addressing the "immediate intention and apparent ability" test, a court's "concern is not that the [allegedly infringing product] will never be produced, but rather that because of the relatively early stage of its develop-

ment, the design [before the court] may not be the design which is ultimately produced and marketed." *Int'l Harvester Co. v. Deere & Co., 623 F.2d 1207, 1216 (7th Cir. 1980).* To satisfy these concerns, "the plaintiff must establish that the product presented to the court is the same product which will be produced if a declaration of noninfringement is obtained." Id.

Although for much of the recent past the "reasonable apprehension of imminent suit" test -- which refers to two-pronged standards like the one announced [*17] in *Starter* -- has governed the determination of an actual case or controversy in the context of intellectual property-related declaratory judgment actions, the Supreme Court's decision in *MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007),* lowered the threshold for proving the existence of such controversies. See *Surefoot LC v. Sure Foot Corp., 531 F.3d 1236, 1240-42 (10th Cir. 2008)* (concluding that the reasonable apprehension of imminent suit test is no longer good law after MedImmune); *SanDisk Corp. v. STMicroelectronics, Inc.., 480 F.3d 1372, 1380 (Fed. Cir. 2007)* ("The Supreme Court's opinion in MedImmune represents a rejection of our reasonable apprehension of suit test."); *Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc., 523 F. Supp. 2d 376, 382 (S.D.N.Y. 2007)* (noting that the Supreme Court "has suggested that a lower threshold is required to find a case or controversy under the Declaratory Judgment Act"); *Linzer Prods. Corp. v. Sekar, 499 F. Supp. 2d 540, 559 (S.D.N.Y. 2007)* (noting that the "reasonable apprehension of suit" test was rejected by the Supreme Court in MedImmune); *Frederick Goldman, Inc. v. West, No. 06 Civ. 3413, 2007 U.S. Dist. LEXIS 50259, 2007 WL 1989291, at *3 (S.D.N.Y. July 6, 2007)* [*18] ("Recent decisions of the Supreme Court have . . . in effect lower[ed] the bar for a plaintiff to bring a declaratory judgment action.").

In MedImmune, the Supreme Court found an actual controversy, even though plaintiff had complied with the defendants' demands by paying royalties under protest, had not infringed any of defendants' rights, and therefore had no reasonable fear of imminent suit. See *MedImmune, 549 U.S. at 128, 137.* In reaching this conclusion, the Court noted that establishing a controversy for purposes of a declaratory judgment action requires no greater showing than that required under Article III. See *id. at 126-27.* The Court held that neither the Act nor Article III requires a plaintiff to expose himself to liability before bringing a declaratory judgment action. See *id. at 137.* Rather, so long as "[t]he factual and legal dimensions of the dispute are well defined" and "nothing about the dispute would render it unfit for judicial resolution," jurisdiction is not defeated by a party's decision to refrain from taking some action and thus "make[] what would

otherwise be an imminent threat [of suit] at least remote, if not nonexistent." *Id. at 128, 137*; see also *SanDisk, 480 F.3d at 1381* [*19] ("[W]here a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license, an Article III case or controversy will arise and the party need not risk suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights."). The true test is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, 549 U.S. at 127.*

While it is clear that the reasonable apprehension of suit test has been rejected, it is unclear whether the "intent and ability" standard has been similarly discredited. On the one hand, that standard is derived from the now-rejected reasonable apprehension of suit test. See *Starter, 84 F.3d at 595* (treating the "intent and ability" test as related to the second prong of the reasonable apprehension of imminent suit test, i.e., whether plaintiff has engaged in a course of conduct bringing it into [*20] adversarial conflict with defendant). On the other hand, the "intent and ability" test stems from the portion of the reasonable apprehension of suit test dealing with the extent to which the parties have been sufficiently brought into adversarial conflict with one another, and nothing in MedImmune purports to have changed the fundamental requirement of adversity. Moreover, the thrust of the "intent and ability" test is the immediacy of the dispute, a requirement the validity of which MedImmune specifically upheld. See *MedImmune, 549 U. S. at 127.*

The court in *Geisha, LLC v. Tuccillo, 525 F. Supp. 2d 1002 (N.D. Ill. 2007),* apparently the only post-MedImmune case addressing the "intent and ability" of a potential infringer, considered whether the controversy requirement was met where a trademark owner sought a declaration of infringement based on defendant's planned opening of a restaurant using the name of the mark at issue. See *id. at 1003, 1007-08.* There, defendant had filed an intent-to-use trademark registration application with the PTO nine months after the opening of plaintiff's restaurant Japonais. See *id. at 1006.* The application pertained to defendant's intended use of a stylized [*21] version of the word Japonais, also in connection with a restaurant. See id. When defendant refused plaintiff's request that it voluntarily abandon the application, plaintiff filed suit in the district court. See *id. at 1007.* Defendant subsequently argued that the court lacked jurisdiction under the Act because there was no "real or immediate controversy." *Id. at 1009.*

Prior to ruling on defendant's claim, the court noted that although defendant had never used the name Japonais in connection with the provision of any restaurant or lounge services, it was undisputed that he had "a firm intent" to do so. *Id. at 1007.* Turning to the merits of the jurisdictional claim, the court noted that the "reasonable apprehension of suit test" was inapposite, not only because "the case reverse[d] the roles of the parties in a typical, 'defensive' declaratory judgment action," but also because the Federal Circuit had discarded the test following MedImmune. *Id. at 1010.* Although the court acknowledged that the test articulated in Lang would normally govern an offensive declaratory judgment of the kind before it, it concluded that the Lang test was also inapposite "[g]iven the close similarity between [*22] [that test] and the traditional reasonable-apprehension-of-suit test." *Id. at 1012-13.* Ultimately, the court concluded that the relevant test was "whether, 'under all the circumstances,' a 'definite and concrete' controversy exists between parties having adverse legal interests; the controversy must be of sufficient 'immediacy and reality' to warrant the issuance of a declaratory judgment,' such that a declaration would not simply amount to 'an opinion advising what the law would be upon a hypothetical state of facts.'" *Id. at 1013,* quoting *MedImmune, 549 U. S. at 127.*

Applying this test, the court's determination hinged largely on the extent to which defendant's preparations to open the allegedly infringing restaurant rendered the dispute of sufficient "immediacy and reality" to constitute a true controversy. See *id. at 1013-17.* Rejecting plaintiff's claim that an actual controversy was presented, the court held that defendant's "actual preparations for opening a restaurant [did] not appear to have advanced significantly beyond [his] statement of intent." *Id. at 1015.* These preparations were limited to "'play[ing] around with' a menu and searching for a suitable location." Id. While [*23] the court acknowledged that the search for a location would normally carry more weight, in this case it found that defendant's search did "not appear either serious or advanced." Id. Defendant had no real estate agent, but was merely driving around looking at properties in locations as diverse as Manhattan's Meatpacking District and Nassau County. See id. These facts, together with the absence of any record evidence that defendant had ever before opened a restaurant, led the court to conclude that defendant's opening of a restaurant using the Japonais mark "was far from imminent when th[e] action was filed." *Id. 1015-16.* The court was careful to note, however, that "it [was] unclear whether the fact that [defendant] was not using the mark would, in itself, defeat declaratory judgment jurisdiction." *Id. at 1018.*

While there are other cases addressing the factual circumstances under which a party's planned production, distribution, or sale of an allegedly infringing product gives rise to a case or controversy, these cases pre-date MedImmune and therefore do not reflect any changes in the applicable legal standard that may have been occasioned by that decision. Nevertheless, because their [*24] reasoning often concerns how close the potential infringer is to actually distributing or selling the allegedly infringing goods or services, the cases provide a useful framework for determining when a dispute is of sufficient "immediacy and reality" to constitute a controversy.

A review of the cases demonstrates that where a party has not yet identified a name or location of a business, or has not secured -- or attempted to secure -- the central components of the formula ordinarily required for production, the case or controversy standard is unlikely to be satisfied. See *Sobini Films v. Tri-Star Pictures, Inc., No. 01 Civ. 6615, 2001 U.S. Dist. LEXIS 23509, 2001 WL 1824039 , at *5 (C.D. Cal. Nov. 21, 2001)* (finding no justiciable case or controversy where plaintiff had not reached any preliminary agreements regarding the proposed film, had not "obtained commitments from 'key talent' such as a director and lead actors," had not contracted with any writers to create the screenplay, and was therefore not "immediately prepared" to produce the film); *Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp., 80 F. Supp. 2d 815, 874-76 (N.D. Ill. 1999)* (finding no controversy where plaintiff had not obtained regulatory [*25] approval for the casino it was requesting the court to deem non-infringing, had no plans to open a casino "on the drawing board," had not entered into any licensing agreements with any entity with the capacity to use the trademark in connection with a casino -- or even identified such an entity -- and could not tell the court how it intended to use its mark in the casino business, much less the name or location of such a casino); *Lang, 895 F.2d at 764-65* (finding no controversy where the allegedly infringing ship's hull would not be completed until at least nine months after the filing of the complaint and "the accused infringers had not distributed sales literature, prepared to solicit orders, or engaged in any activity indicating that the ship would soon be ready for sea").

Where, however, a party has produced prototypes or samples of the allegedly infringing products, begun soliciting -- and advertising to -- potential customers, or otherwise invested significant sums of money in preparation for producing the goods, the case or controversy requirement is likely to be satisfied. See *Starter, 84 F.3d at 596* (finding a case or controversy where plaintiff had "designed styles and prepared [*26] prototype shoes; conducted a consumer survey; made strategic decisions

regarding who should manufacture the shoes; hired an external licensing agent; . . . attempted to find a manufacturing partner"; and was therefore "immediately prepared, at the time the complaint was filed, to begin manufacture and sale of shoes bearing the [marks at issue]") [7]; *Menashe v. V Secret Catalogue, Inc.*, No. 05 Civ. 239, 2005 U.S. Dist. LEXIS 13324, 2005 WL 1580799, at * 6 (S.D.N.Y. July 7, 2005) (finding a controversy where plaintiffs had registered a domain name related to the mark, retained a web-designer, filed an intent-to-use application with the PTO, "paid for . . . and received four hundred samples of their product, as well as eight final articles that would serve as prototypes[,] and . . . engaged in activities including interviews and photo shoots to promote their lingerie line"); *Dr. Reddy's Labs., Ltd. v. aaiPharma Inc.*, No. 01 Civ. 10102, 2002 U.S. Dist. LEXIS 17287, 2002 WL 31059289, at *9 (S.D.N.Y. Sept. 13, 2002) (finding an actual controversy where plaintiff had obtained tentative FDA approval of a generic version of a drug and spent millions of dollars on the development of the product, including on construction of a plant to manufacture it). [*27]

7 The Starter Court seems to have construed the phrase "immediately prepared" rather broadly. The court itself acknowledged that Starter alleged only that it had "attempted to find a manufacturing partner," and not that it had actually found one. Absent its having identified such a partner, it is unclear how Starter could literally have been "immediately prepared" to begin manufacture and sale at the time the complaint was filed.

The foregoing precedent supports the conclusion that the current dispute satisfies the case or controversy requirement, and that the Court therefore has jurisdiction over plaintiff's claims, even under pre-MedImmune case law. This is not a case in which defendants "do not appear to have advanced significantly beyond [their] statement of intent." *Geisha, 525 F. Supp. 2d at 1015.* Far from relying solely on defendants' mere intent to infringe, which courts have found insufficient to demonstrate an actual controversy, plaintiff has alleged that defendants have taken significant steps toward realizing that intent, [8] including "actively seeking licensees to publish a magazine called 'Modern Maturity'" and "conduct[ing an] extensive analysis of the publishing industry." [*28] (Compl. P 23.) While defendants may not have settled on a licensing partner, the Court must accept as true plaintiff's allegation that they have been actively searching for one. Plaintiff need not wait for defendants to actually secure that partner before filing suit. Securing a licensing partner to undertake actual publication of the magazine presumably occurs only after one has made a number of concrete decisions concerning the proposed content, design, and layout of the magazine. Thus, once a

licensing partner is identified, little will remain for defendants to do other than commence production, distribution, and sale of the magazine.

8 While defendants' motions to dismiss may be resolved on the basis of the pleadings, it should be noted that defendants have admitted to possessing documents pertaining to the Modern Maturity mark, including those related to: the design, creation, selection or adoption of the Modern Maturity mark (Doc. Req. No. 6); defendants' intent to use the mark for a magazine (Doc. Req. No. 9); defendants' plans to sell magazines under the Modern Maturity mark (Doc. Req. No. 12); the nature of the planned Modern Maturity magazine (Doc. Req. No. 15); and the business, [*29] marketing, and media plans for the magazine (Doc Req. No. 30). (See also Dabney Decl. Ex. 1; P. Mem. 4.) Defendants' responses to plaintiff's document requests bolster the conclusion that defendants have taken concrete steps to bring their plans to fruition.

Since finding a case or controversy in this case is consistent with pre-MedImmune case law, it is unnecessary to decide precisely how much that decision loosened the case or controversy tests previously applied. There is no doubt that the circumstances of this case present a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, 549 U.S. at 127.* Accordingly, defendants' motion to dismiss for lack of jurisdiction is denied. [9]

9 Contrary to defendants' argument, plaintiff's request for a declaration of the validity of its registration is properly before the Court. (D. Mem. 9-10.) This case involves allegations of trademark infringement that present an actual controversy, as well as a request for a declaration of validity. In such situations, "the interest in prompt adjudication far outweighs the value of having the [*30] views of the PTO," particularly where a party seeks declaratory relief. *Goya Foods, Inc. v. Tropicana Prods., Inc.*, 846 F.2d 848, 853-54 (2d Cir. 1988); see also *Burkina Wear, Inc. v. Campagnolo, S.R.L.*, No. 07 Civ. 3610, 2008 U.S. Dist. LEXIS 29031, 2008 WL 1007634, at *4 (S.D.N.Y. Apr. 9, 2008).

### III. Motion To Dismiss for Failure To State a Claim

Defendants also argue that because plaintiff has not alleged that defendants have actually used the Modern Maturity mark in commerce, the complaint should be dismissed for failure to state a claim. (D. Mem. 2-8.) In

support of this argument, defendants reiterate their contention that use in commerce cannot exist absent the actual publication, distribution, sale, or offering for sale of a magazine bearing the Modern Maturity mark. (D. Mem. 6; D. Reply Mem. 3.) As before, plaintiff contends that defendants' significant planning efforts, including creating business plans, conducting extensive market analysis, and actively seeking licensees to publish its magazine, satisfy the "use in commerce" standard. (P. Mem. 1, 3-4.) Because trademark infringement and related claims brought pursuant to the Lanham Act and state law are not contingent on the actual sale of an allegedly [*31] infringing product, and because plaintiff has alleged that defendants have promoted the production of their magazine through use of the Modern Maturity mark, defendants' motion to dismiss must fail.

"Trademark infringement, as codified in the Lanham Act, is not limited to situations where the infringing mark has been used in connection with the actual sale of a product. . . . [Rather], courts have found that trademark infringement litigation may proceed even in the absence of the product having been sold." *PDK Labs, Inc. v. Proactive Labs, Inc., 325 F. Supp. 2d 176, 180 (E.D.N.Y. 2004)*; see also id. ("[A]lthough Proactive has not actually sold the product with the allegedly infringing packaging, its promotion of the product on its web site and at trade shows is sufficient to constitute a tort under the language of the Lanham Act and the supporting case law."); *Bertolli USA, Inc. v. Filippo Bertolli Fine Foods, Ltd., 662 F. Supp. 203, 205 (S.D.N.Y. 1987)* (rejecting defendants' claim that injunctive relief could not be granted where the product had not been advertised or sold to the general public and finding the "use in commerce" element satisfied where defendants sent one bottle of [*32] olive oil to a distributor, offered the product to another, and printed labels and cartons for the allegedly infringing oil); *Harrison Servs., Inc. v. AI Margino, 291 F. Supp. 319, 321 (S.D.N.Y. 1968)* (denying defendant's *12(b)(1)* and 12(b)(6) motions to dismiss because plaintiff alleged more than a "mere intent" to violate the Lanham Act where it alleged that defendant had solicited department stores to participate in the catalog at issue and contacted manufacturers about displaying their products in the catalog). Cf. *Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd., 808 F. Supp. 952, 957 (E.D.N.Y. 1992)* ("In a trademark infringement action, a court may grant injunctive relief 'even before defendant actually opens the business,' so long as the threatened act of defendant is 'imminent and impending.'"); *Hertz Corp. v. Knickerbocker, 206 F. Supp. 305, 306 (S.D.N.Y. 1962)* (granting defendant's *12(b)(1)* and 12(b)(6) motions to dismiss because the complaint did not allege that defendants had used the mark "in commerce and in conjunction with services," but only that the certificate of incorporation indicated an intent by the corporation to use such mark) .

"To establish a trademark infringement [*33] claim under the Lanham Act, a plaintiff must show that the defendant used in commerce, without the plaintiff's consent, a 'reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services or in connection with which such use is likely to cause confusion." [10] *Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474, 477 (2d Cir. 1996)*, quoting 15 U.S.C. § 1114(1)(a); see also 1-800 Contacts, Inc. v. WhenU.com, Inc., 414 F.3d 400, 406-07 (2d Cir. 2005) (noting that a plaintiff can prevail under § 1114 where he demonstrates that he has a valid mark entitled to protection, that defendant has used the mark in commerce "in connection with the sale . . . or advertising of goods or services" without plaintiff's consent, and that such use is likely to cause confusion). In determining whether a plaintiff has established a likelihood of confusion, a court considers the eight factors outlined in *Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961)*. The factors are: (1) strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity [*34] of the products; (4) the likelihood that the prior owner will bridge the gap (i.e., enter the alleged infringer's market); (5) actual confusion; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the buyers. Id.

> 10   According to the Lanham Act, "a mark shall be deemed to be in use in commerce -- (1) on goods when -- (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and (B) the goods are sold or transported in commerce." 15 U.S.C. § 1127.

Here, defendants argue only that plaintiff has failed to sufficiently allege their use in commerce of the Modern Maturity mark. As previously discussed, however, plaintiff has alleged that defendants "are actively seeking licensees to publish a magazine called 'Modern Maturity'" and "have conducted [an] extensive analysis of the publishing industry" in preparation for the launch of such magazine. (Compl. P 23.) It is reasonable to infer that, in doing so, defendants [*35] have not only used the Modern Maturity mark, but have done so through the channels of commerce. Indeed, it would be difficult to fathom defendants pitching their Modern Maturity magazine concept to a potential publisher without providing the publisher with some sort of mock-up or prototype. Any such mock-up or prototype would likely use the Modern Maturity mark, as defendants concede that this is the

2009 U.S. Dist. LEXIS 969, *

name of their planned magazine. Even without such a prototype, the pitch itself would necessarily involve the transmission of ideas pertaining to magazine content, design, and layout, including the offending name. Applicable standards of pleading do not require plaintiff to identify the specific manner in which such information was transmitted. See *Fed. R. Civ. P. 8(a)(2)* (requiring only "a short and plain statement of the claim"); *Twombly, 127 S. Ct. at 1974* (requiring plaintiff to allege only "enough facts to state a claim to relief that is plausible on its face"). Plaintiff has alleged facts giving rise to a reasonable inference that defendants have used the Modern Maturity mark in commerce, and this is sufficient.

For the foregoing reasons, plaintiff has adequately alleged defendants' **[*36]** use in commerce of the Modern Maturity mark. Defendants' motion to dismiss is therefore denied. [11]

> 11  The Court need not address the propriety of any claim for injunctive relief. Defendants consented to the preliminary injunction entered by the Court, and any comment on the merits of a claim for permanent injunctive relief would be premature. See *Patsy's Italian Restaurant, Inc. v.*

*Banas, 575 F. Supp. 2d 427, 464 (E.D.N.Y. 2008)*, quoting *Roach v. Morse, 440 F.3d 53, 56 (2d Cir. 2006)* (quotation omitted) ("To obtain a permanent injunction in a trademark action, a party 'must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted.'"); see also *A.V. by Versace, Inc. v. Gianni Versace S.p.A., No. 96 Civ. 9721, 2005 U.S. Dist. LEXIS 925, 2005 WL 147364, at *5 (S.D.N.Y. Jan. 24, 2005)* (same).

## CONCLUSION

For the reasons set forth above, defendant's motion to dismiss is denied.

SO ORDERED.

Dated: New York, New York

January 6, 2009

/s/ Gerard E. Lynch

GERARD E. LYNCH

United States District Judge